COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





JESSE AROCHA,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee. 

§


 


§


 


§


 


§


 


§



§

No. 08-07-00108-CR



Appeal from


 399th District Court


of Bexar County, Texas


(TC # 2006CR0870A)




O P I N I O N



 Jesse Arocha appeals his conviction of burglary of a habitation. A jury found him guilty and
the trial court assessed punishment at a fine of $1,500 and imprisonment for six years but suspended
the sentence and placed Appellant on community supervision for six years. The Texas Supreme
Court transferred the appeal to this Court by docket equalization order entered on April 2, 2007. For
the reasons that follow, we affirm.

FACTUAL SUMMARY


 On November 7, 2005, Audrie Herrera took her two youngest children to school at
approximately 6:45 a.m. and then dropped her husband off at work at 7 a.m. Herrera's oldest son,
twelve-year-old Jeremy, did not join them because he walked to school. After dropping off the
children, Herrera went to pay her electric bill and returned home around 8 a.m. Nobody was at her
house when she returned and there were no vehicles in the driveway. After entering the house,
Herrera noticed that her DVD player was missing. She went into her bedroom and noticed that the
closet door and drawers were open as if someone had been looking for something. Upon seeing that
some DVDs were also missing, she thought Jeremy might have taken the player and DVDs or loaned
them to one of his friends without asking. Herrera immediately drove to Jeremy's school to speak
with him about it before classes started. But Jeremy said he did not know what she was talking
about and they went together back to the house. Herrera pulled onto their street about 8:15 a.m. and
noticed a gray vehicle in front of her home facing the wrong direction. A darker Hispanic male was
in the driver's seat and a lighter Hispanic male was in the rear passenger seat. Both of them were
wearing white tee shirts. Herrera also saw an African-American male running from her home toward
the gray car and carrying something under his arm. He slid over the trunk and got into the right
front passenger seat. Herrera "floored it" and attempted to block the gray vehicle from exiting the
cul-de-sac, but she was going too fast and struck the right front quarter panel of the other car,
effectively pinning it against the curb. The impact also flattened the right front tire of the gray car. 
At trial, Herrera made a positive in-court identification of Appellant as the driver. She had seen the
faces of the three men who were shocked she had hit their car. Appellant threw the car in reverse
and Herrera could hear the tires squealing as he tried to get away. The gray car was finally freed and
it left, although one of its hubcabs had fallen off as a result of the collision. Herrera told Jeremy to
run to the neighbors and call 911, and she ran after the gray car to see in which direction it had gone. 
The police arrived quickly. Herrera described the vehicle and the three men, and told the officers
the direction in which they were traveling. Herrera went inside her home with the officers and found
a broken kitchen window in the rear of the house. She also discovered that several music CDs, her
son's Playstation, and a pink pillowcase were also missing. She told the police what items had been
taken in the burglary. After a few minutes, the officers escorted Herrera and her son to a nearby
apartment complex and asked whether she recognized any of the vehicles there. Herrera saw the
gray Honda and told the officers it was the same car. The officers then told her they had three
suspects in custody. While Herrera and Jeremy sat in the back seat of a patrol car, the police brought
the suspects into view one-by-one and they viewed each suspect from a distance of about twenty feet. 
She and Jeremy identified the three men as the same ones they had seen just minutes before at their
house. Basing her identification on his face, Herrera identified Appellant as the driver. The police
later showed Herrera numerous items of property recovered from the gray Honda. She identified the
following as her property taken in the burglary: thirty-five DVD movies, five Playstation games,
forty-two music CDs, two CD players, earphones, a Cyberhome DVD player, and a pink pillowcase. 
 Officer Thomas Jefferson of the San Antonio Police Department was dispatched to Herrera's
house and he spoke with her about the morning's events. She told him her home had been
burglarized and she had struck their car with her car as they tried to leave. Herrera also provided a
description of the three suspects. The first suspect was a black male wearing a white shirt and black
headband or "do-rag" whom she saw leave her home and get into the front passenger seat of a gray
Honda Civic. The second suspect was the driver, and the third suspect was sitting in the rear
passenger seat. Jefferson immediately put out over the radio the description of the suspects, the
vehicle, and the direction they were traveling. Jefferson remained at the house with Herrera to
preserve evidence and he continued to gather information about the burglary and the property taken. 
Five to seven minutes after making the radio report, a police officer notified Jefferson that he had
made contact with possible suspects and a vehicle matching Herrera's description at a nearby
apartment complex. Jefferson took Herrera and her son to the complex and she identified a gray
Honda. Herrera and her son first viewed Joseph Stewart, an African American male, and both
identified him as the person seated in the front passenger seat. They next viewed Appellant and both
identified him as the driver. Finally, the officers presented Jacob Lao and Herrera and Jeremy
identified him as the person seated in the back seat of the Honda.

 Officer Eduardo Rodriguez of the San Antonio Police Department was dispatched to a
burglary in progress and he arrived in approximately one minute. Herrera told him that two Latin
males and one black male had fled in a gray Honda. She also stated that the vehicle had damage to
its right front quarter panel and a flattened tire and she indicated the direction in which the gray
Honda had traveled when the suspects fled. Rodriguez could see that the suspects' vehicle had left
a trail for him to follow because the rim was making contact with the asphalt. Rodriguez followed
the trail to an apartment complex located near Herrera's house. Looking at the vehicles in the
parking area, Rodriguez quickly found a gray Honda Civic with damage to the right front quarter
panel and two Hispanic males were changing the right front tire. Rodriguez also noticed that the
hubcap was missing. Rodriguez identified Appellant as one of the two males. As Rodriguez exited
his patrol car and approached, both Appellant and the other male, Jacob Lao, appeared extremely
nervous and kept asking Rodriguez why he was there. Fearing Appellant and Lao might flee,
Rodriguez handcuffed them. Other officers found the third suspect, Joseph Stewart, in the apartment
complex. 

 Jose Arias, a crime scene technician with the San Antonio Police Department, photographed
and processed evidence at Herrera's home and at the apartment complex. Arias collected the hubcap
which had been torn off of the suspect vehicle and left in the street near Herrera's car. When Arias
processed the gray Honda at the apartment complex, he found items which matched the
complainant's description of property taken in the burglary. He took the property to Herrera's home
and she identified it as the property taken during the burglary that morning. Arias also processed for
fingerprints the complainant's home, the recovered property, and the gray Honda. He collected three
latent print cards from the exterior surface on top of the trunk lid, two latent print cards from the
exterior surface of the Honda's right rear window, and one on the window screen at the burglars'
point of entry into the home.

 Vernon Ginn, a fingerprint examiner, matched the latent print taken from the exterior trunk
of the gray Honda with the known print of Joseph Stewart, the individual both Herrera and Jeremy
described as leaping and sliding across the trunk as he fled. Ginn was unable to match any of the
other latent prints.

 Jeremy Vasquez, the complainant's son, testified at trial. Everyone else in the family had
already left the house when Jeremy left for school around 7:30 a.m. He was hanging out with his
friends before school started when his mother approached and asked what he had done with the DVD
player. He told her he did not know what she was talking about so she took him to the car and they
drove back home. While they were stopped at a light, they could see a silver Honda Civic parked
in front of their house. His mother did not recognize the car and she sped toward the house. Just
as they got close, they saw a black male with something under his right arm running from their front
porch toward the silver Honda. The black male was wearing a black "do-rag" on his head. After
the black male got in the Honda, Jeremy's mother hit the car but the driver was able to get the car
in reverse and leave. His mother could not follow them because the wheel had fallen off the car. 
The silver Honda also had a flat tire. Jeremy called 911from a neighbor's house and the police
arrived in a few minutes. Within five or ten minutes, the police took Jeremy and his mother to an
apartment complex to view some suspects. Nobody suggested to Jeremy or his mother that these
were the same men who had burglarized his house. Jeremy viewed three suspects one-by-one and
identified them as the same three men he had seen just minutes earlier at his home. Jeremy also
made an in-court identification of Appellant as the driver of the silver Honda. When challenged
about his identification, Jeremy said he was sure that Appellant was the driver.

 Joseph Stewart testified on Appellant's behalf at trial. He admitted committing the burglary
of the Herreras' home on November 7, 2005. At the time, Stewart was living in Floresville but he
also lived in an empty apartment at the complex where they were arrested. Stewart owned the gray
Honda used during the commission of the burglary. Stewart knew Appellant through Jacob Lao but
he considered Appellant as only an acquaintance. Stewart did not have any money so he decided to
commit a burglary. Lao drove Stewart's car while Stewart sat in the front passenger seat. Stewart
picked the Herreras' house at random. Lao dropped Stewart off at the house and he burglarized it
while Lao drove the car back to the apartment complex and waited for him. Stewart returned to the
apartment complex and Lao picked him up so they could return to the house. At the house, a car
driven by a woman rammed them but they were able to back up and get away even though the Honda
had a flat tire. They went to the opposite side of the apartment complex where Appellant lived
because they knew they could not be seen from the house Stewart had just burglarized. Stewart
wanted to fix the tire as fast as he could and leave the area because he knew the police would be
looking for him. Stewart was too nervous to change the tire so Lao asked Appellant to help him
while Stewart went to the apartment. The police came for Stewart and took him to an area in the
complex to be identified. Stewart told the police that only one other person was involved in the
burglary with him and he gave a written statement indicating that Appellant did not participate in
the burglary. On his judicial confession made when he entered his guilty plea, Stewart crossed out
the sentence in which he admitted acting in concert and as a party with Lao and Appellant. During
cross-examination, the prosecutor established that as part of his guilty plea, Stewart had stipulated
that the police reports were correct. Those reports indicated that Appellant had committed the
burglary with Stewart and Lao. Stewart was unaware that Lao had accepted responsibility for his
part in the burglary and had implicated Appellant in the commission of the burglary.

 Veronica Rodriguez, Appellant's former girlfriend, testified that Appellant spent the night
with her on November 7, 2005. Rodriguez lived with Eloise Andrade at the apartment complex.
Andrade's boyfriend, Junior, was also at the apartment. Appellant took Andrade's children to school
the next morning and then returned to the apartment at around 7:45 or 8 a.m. At first, Veronica said
that Andrade's mother arrived to give Andrade a ride to work and mentioned that the police were
at the apartment complex. Then stating that she was confused, Veronica corrected her testimony to
say that sometime after 8 a.m., Jacob Lao knocked on the door and asked to use the phone because
he needed help changing a flat tire. Veronica noticed that Lao was frantic and she told Appellant
to help him. After a little while, Andrade's boyfriend, Junior, left to throw out the trash and saw that
the police were arresting Appellant, Lao, and Stewart. Veronica tried to tell the police that Appellant
had been with her that morning, but they would not listen to her and told her to leave or they would
arrest her. Veronica testified on Appellant's behalf because he had always been there for her. After
Appellant's arrest, Veronica did not make any effort to tell anyone that Appellant had been with her
that morning because she got back together with her boyfriend and had a baby. A court-appointed
investigator "tracked [her] down" and she gave a written statement on August 1, 2006. 

 The court's charge included an instruction on the law of parties and the application paragraph
asked the jury to determine whether Appellant was guilty of burglary of a habitation as either the
primary actor or as a party. The jury rejected Appellant's alibi defense and found him guilty of
burglary of a habitation. The trial court assessed Appellant's punishment at a fine of $1,500 and
imprisonment for six years but suspended the sentence and placed Appellant on community
supervision for six years. The Texas Supreme Court transferred the appeal to this court by order
entered on April 2, 2007.

JURISDICTIONAL CHALLENGE


 In his first four issues, Appellant challenges the jurisdiction of this court over his appeal. He
first argues that Section 73.001 of the Government Code is unconstitutional and violative of the
Equal Protection Clause because it does not give proper effect to Texas voters who elect the justices
of the intermediate appellate courts. Second, he contends we do not have jurisdiction of this appeal
because the Supreme Court's transfer order is unconstitutional due to a conflict between the Texas
Constitution and Chapter 73 of the Government Code. Third, Appellant claims jurisdiction is absent
because the transfer order violates the equal protection and due course of law provisions of the Texas
Constitution. Finally, Appellant maintains that the transfer order is unconstitutional because it is a
void exercise of legislative authority over the judiciary in violation of the Separation of Powers
provision found in Article 2, Section 1 of the Texas Constitution. He asks us to transfer the case
back to the Fourth Court of Appeals.

 To preserve a complaint for appellate review, a party must raise the issue by a timely and
specific objection or motion. See Tex.R.App.P. 33.1(a). Even constitutional errors may be waived
by failure to object. Wright v. State, 28 S.W.3d 526, 536 (Tex.Crim.App. 2000); Broxton v. State,
909 S.W.2d 912, 918 (Tex.Crim.App. 1995). Generally a party on appeal is seeking to raise a
complaint about some ruling of the trial court. In this case, however, Appellant is complaining about
an action of the Texas Supreme Court after he filed his notice of appeal to the Fourth Court of
Appeals. The issues we must decide are whether Appellant is obligated to preserve his complaints
about the transfer order and the constitutionality of Section 73.001, as applied to him, and if so, how
does he preserve the error?

 The Supreme Court transferred several appeals, including the instant appeal, to this court
pursuant to Section 73.001 of the Texas Government Code. That section provides:

 The supreme court may order cases transferred from one court of appeals to another
at any time that, in the opinion of the supreme court, there is good cause for the
transfer.


Tex.Gov't Code Ann. § 73.001 (Vernon 2005). Although the authority granted to the Supreme
Court by Section 73.001 is typically exercised to equalize the dockets of the intermediate appellate
courts, the statute does not limit the Supreme Court's authority to that purpose. Miles v. Ford Motor
Company, 914 S.W.2d 135, 137 (Tex. 1995).

 Appellant states his issues in terms of a challenge to our jurisdiction. Generally, a party is
not required to preserve a challenge to the court of appeals' jurisdiction which is defined by the
Texas Constitution and by statute. See Tex.Const. art. V, § 1 (courts in which judicial power is
vested), Tex.Const. art. V, § 6 (1) (courts of appeals); Tex.Gov't Code Ann. § 21.001 (Vernon
2004)(inherent power and duty of courts), Tex.Gov't Code Ann. § 22.220 (civil jurisdiction),
Tex.Gov't Code Ann. § 22.201 (Vernon Supp. 2008)(courts of appeals districts), Tex.Gov't Code
Ann. § 22.221 (writ power), Tex.Gov't Code Ann. §§ 73.001-73.002 (transfer of courts of appeals'
cases); Tex.Code Crim.Proc.Ann. art. 4.01 (Vernon 2005)(providing that courts of appeals have
jurisdiction in criminal actions); Tex.Code Crim.Proc.Ann. art. 4.03 (providing that "[t]he Courts
of Appeals shall have appellate jurisdiction coextensive with the limits of their respective districts
in all criminal cases except those in which the death penalty has been assessed."). Section 73.002
specifically provides:

 (a) The court of appeals to which a case is transferred has jurisdiction of the case
without regard to the district in which the case originally was tried and to which it is
returnable on appeal.


Even if Section 73.001 is unconstitutional as applied to Appellant, we would not be divested of
jurisdiction. Accordingly, we conclude that Appellant is not excused from preserving the
constitutional arguments he raises with respect to the transfer order.

 The Texas Supreme Court has established that the proper procedure for obtaining a transfer
is by motion:

 The party requesting a transfer should file a copy of the motion to transfer in each of
the two courts of appeals, asking that, when the motion is forwarded to the Supreme
Court, each court of appeals advise the Supreme Court in writing whether it has any
objection to the proposed transfer. Any briefs in favor of the proposed transfer
should also be filed in each court of appeals and forwarded with the transfer motion. 
We will then have the motion, the briefs, and the comments of the two courts of
appeals in determining whether to grant the motion to transfer.


Miles, 914 S.W.2d at 137 n.2.

 Citing Miles, the State maintains that Appellant has not followed the proper procedure for
seeking transfer of his case back to the Fourth Court of Appeals. In his reply brief, Appellant
responds that he should not have to "acquiesce" to the authority of the Supreme Court in order to
have his "criminal law matter" transferred back to the Fourth Court of Appeals. But he fails to
recognize that if he had followed the established procedure and the Supreme Court had granted his
motion and transferred the appeal back to the Fourth Court of Appeals, his complaints about the
constitutionality of Section 73.001 would be completely remedied. That is the very purpose of
requiring a timely and specific objection. If, on the other hand, the Supreme Court denied his
motion, then we would be in a position to address the constitutional issues he raises. Because
Appellant has refused to avail himself of an established procedure which potentially could remedy
the alleged constitutional violations, we conclude that he has failed to preserve his complaints about
the transfer of his appeal. Having said that, we pause to note that we share some of Appellant's
concerns about the docket equalization process. To some extent, recent rule amendments have
improved the situation. (2)
 And we applaud both defense counsel and the State for their excellent
briefing and arguments on these issues. But because the issues are not ripe for our review, we must
overrule Issues One through Four.

FACTUAL SUFFICIENCY OF THE EVIDENCE


 In Issue Five, Appellant challenges the factual sufficiency of the evidence supporting his
conviction of burglary. More specifically, he argues the evidence is factually insufficient to prove
his identification because the identification procedure was unduly suggestive and rendered the in-court identification by Herrera and Jeremy untrustworthy.

Standard of Review


 A factual sufficiency review begins with the presumption that the evidence supporting the
conviction is legally sufficient. Clewis v. State, 922 S.W.2d 126, 134 (Tex.Crim.App. 1996). In
reviewing factual sufficiency of the evidence to support a conviction, we are to view all the evidence
in a neutral light, favoring neither party. Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000);
Clewis, 922 S.W.2d at 129. In reviewing legal and factual sufficiency challenges, we consider all
of the evidence, whether admissible or inadmissible. Powell v. State, 194 S.W.3d 503, 507
(Tex.Crim.App. 2006); Marshall v. State, 210 S.W.3d 618, 625 (Tex.Crim.App. 2006). We
determine whether the fact finder was rationally justified in finding guilt beyond a reasonable doubt. 
Watson v. State, 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). The fact finder is the exclusive judge
of the witnesses' credibility and the weight to be given their testimony. Swearingen v. State, 101
S.W.3d 89, 97 (Tex.Crim.App. 2003). Further, the reviewing court must give due deference to the
fact finder's determinations. Johnson, 23 S.W.3d at 10-12. The judgment should not be set aside
unless the evidence supporting the verdict is so weak as to be clearly wrong and manifestly unjust
or the verdict is against the great weight and preponderance of the evidence. Watson, 204 S.W.3d
at 411.

Identification


 To prove burglary of a habitation, the State must prove beyond a reasonable doubt that the
defendant entered a habitation without the owner's consent and with the intent to commit a felony,
theft, or assault. Tex.Penal Code Ann. § 30.02(a)(1)(Vernon 2003). The State must prove beyond
a reasonable doubt that the defendant is the person who committed the charged offense. Johnson
v. State, 673 S.W.2d 190, 196 (Tex.Crim.App. 1984). The indictment alleged that Appellant
intentionally and knowingly entered a habitation without Audrie Herrera's consent and with the
intent to commit theft. An individual can be charged as a party to an offense and can be held
criminally responsible for the conduct of another when that individual acts in concert with another
person in committing an offense. Tex.Penal Code Ann. §§7.01-7.02 (Vernon 2003). 
Circumstantial evidence alone may be used to prove that a person is a party to an offense. Beardsley
v. State, 738 S.W.2d 681, 684 (Tex.Crim.App. 1987). Furthermore, a person can be convicted as
a party even if the indictment does not explicitly charge him as a party. Marable v. State, 85 S.W.3d
287, 288 (Tex.Crim.App. 2002). An individual can be guilty of burglary of a habitation even though
he does not personally enter the burglarized premises if he is acting together with another in the
commission of the offense. Powell v. State, 194 S.W.3d 503, 507 (Tex.Crim.App. 2006). The
court's charge included an instruction on the law of parties and the application paragraph applied the
law of parties to the facts of this case.

Review of the Evidence


 Appellant did not file a motion to suppress the in-court identification or object to his in-court
identification by either Herrera or Jeremy. Therefore, the in-court identification by these witnesses
is not subject to suppression in the context of this factual sufficiency challenge and we will not
review the admissibility of the in-court identification. Stated differently, a determination that the
witnesses' identifications were based on an impermissibly suggestive pretrial procedure would not
render the evidence insufficient.

 Herrera and her son Jeremy both had an opportunity to view Appellant immediately after
Herrera crashed her car into the gray Honda Civic. Herrera and Jeremy provided a description of the
suspects and their car to the police. Within minutes, the police found a car and three suspects which
matched the descriptions provided by Herrera and Jeremy. A police officer took Herrera and Jeremy
to the apartment complex and Herrera identified the gray Honda as the same car she had hit. Both
Herrera and Jeremy had an opportunity to view Appellant at the apartment complex and both
identified him as the driver of the car. At trial, each of these witnesses made an in-court
identification of Appellant as the driver of the gray Honda and they remained firm in their
identification even in the face of cross-examination. Appellant presented two witnesses at trial, his
co-defendant Stewart and his former girlfriend Veronica Rodriguez, who testified that Appellant did
not participate in the burglary. It was the jury's task to weigh the credibility of all the witnesses and
to resolve this conflict in the evidence. The jury resolved these issues against Appellant and rejected
his alibi defense. We conclude that the evidence is factually sufficient to prove that Appellant is the
person who committed the charged offense. Issue Five is overruled.

COMMENT BY TRIAL COURT


 In his final issue, Appellant complains that the trial court erred in commenting during defense
counsel's opening statement. The State responds that any error is waived because Appellant failed
to object. 

 Counsel argued that the identification of Appellant was based solely on the testimony of
Herrera and Jeremy and that they were mistaken. The State objected that this amounted to argument
rather than a summation of the evidence they intended to present. The trial court did not rule on the
objection and instructed defense counsel to proceed. The following then occurred:

 [Defense counsel]: So, hopefully, our witnesses will be able to clarify a lot of that
information. Now, ladies and gentlemen, you need to remember what the burden of
proof is here. The burden of proof is how much the district attorney's office has to
prove to you-all or conviction you all of the truthfulness of what happened on this
particular day.


 [The prosecutor]: That's an incorrect statement, as well. Our burden is beyond a
reasonable doubt. It's up to them to make that determination.


 [Defense counsel]: I'm sorry, Kathy. I was getting there. Their particular burden in
this type of case is beyond a reasonable doubt. Now, beyond a reasonable doubt can
mean a lot of things to every person. I mean, every person has a different opinion. 
You know, if I ask what the color of my shirt was? Everybody would probably say
something different. There's a name for everything. There's mauve, purple, dark
blue, whatever. Everyone has a different opinion, except in this particular instance,
beyond a reasonable doubt has to be something extremely convincing to yourself. 


 [The prosecutor]: Again, I'm going to object to this. There's no definition. She's
interjecting a definition. I apologize for the discrepancy. There's a proper instruction
to the jury. The jury is given a chance at the end, and there's not a definition, and
I'm objecting to any suggestion of what the definition is; there is none.


 [Defense counsel]: Your Honor, that's what I'm saying, that every individual has a
different opinion.


 [The Court]: Ladies and gentlemen of the jury --


 [The prosecutor]: And it's argumentative.


 [The Court]: -- a reasonable doubt is a doubt based on reason, and we have to rely
on your individual sense of reason, sense of reason that each of you possess. Each
of you must decide for yourselves whether there is a reasonable doubt or whether
there is not. Go ahead, please. 


Defense counsel did not object to the trial court's statement but instead proceeded with the opening
statement.

 A party must bring an error to the trial court's attention by a timely and specific motion or
objection. Tex.R.App.P. 33.1. The contemporaneous objection rule applies to allegedly improper
comments by the trial judge. See Fuentes v. State, 991 S.W.2d 267, 276 (Tex.Crim.App. 1999)
(failure to object to trial court's comments constituted waived); Beltran v. State, 99 S.W.3d 807, 811
(Tex.App.--Houston [14th Dist.] 2003, pet. ref'd)(holding defendant failed to preserve error with
respect to trial court's comments because defendant failed to object). Appellant argues, however,
that the trial court's comment was so egregious that an instruction would not have cured the error,
and therefore, he was excused from objecting. Appellant cites no authority in support of his
contention that he is excused from preserving error. Further, he does not argue that the trial court's
comments rise to the level of fundamental error, taint the presumption of innocence, or vitiate the
jury's impartiality. See Jasper v. State, 61 S.W.3d 413, 421 (Tex.Crim.App. 2001). Because
Appellant failed to object to the trial court's comments, we find that he waived error. Issue Six is
overruled. Having overruled each issue presented for review, we affirm the judgment of the trial
court.

June 30, 2009 

 ANN CRAWFORD McCLURE, Justice


Before Chew, C.J., McClure, and Carr, JJ.

Carr, J., not participating


(Do Not Publish)
1. Article V, Section 6 of the Texas Constitution provides: 


 Sec. 6. (a) The state shall be divided into courts of appeals districts, with each district having a Chief
Justice, two or more other Justices, and such other officials as may be provided by law. The Justices
shall have the qualifications prescribed for Justices of the Supreme Court. The Court of Appeals may
sit in sections as authorized by law. The concurrence of a majority of the judges sitting in a section is
necessary to decide a case. Said Court of Appeals shall have appellate jurisdiction co-extensive with
the limits of their respective districts, which shall extend to all cases of which the District Courts or
County Courts have original or appellate jurisdiction, under such restrictions and regulations as may
be prescribed by law. Provided, that the decision of said courts shall be conclusive on all questions
of fact brought before them on appeal or error. Said courts shall have such other jurisdiction, original
and appellate, as may be prescribed by law.


Tex.Const. art. V, §6.
2. Effective September 1, 2008, Rule 41.3 was added to the Texas Rules of Appellate Procedure:

 

 41.3. Precedent in Transferred Cases.

 In cases transferred by the Supreme Court from one court of appeals to another, the court of appeals
to which the case is transferred must decide the case in accordance with the precedent of the transferor
court under principles of stare decisis if the transferee court's decision otherwise would have been
inconsistent with the precedent of the transferor court. The court's opinion may state whether the
outcome would have been different had the transferee court not been required to decide the case in
accordance with the transferor court's precedent.


The Comment to the 2008 change provides:


 Subdivision 41.3 is added to require, in appellate cases transferred by the Supreme Court under
Section 73.001 of the Government Code for docket equalization or other purposes, that the transferee
court must generally resolve any conflict between the precedent of the transferor court and the
precedent of the transferee court--or that of any other intermediate appellate court the transferee court
otherwise would have followed--by following the precedent of the transferor court, unless it appears
that the transferor court itself would not be bound by that precedent. The rule requires the transferee
court to "stand in the shoes" of the transferor court so that an appellate transfer will not produce a
different outcome, based on application of substantive law, than would have resulted had the case not
been transferred. The transferee court is not expected to follow the transferor court's local rules or
otherwise supplant its own local procedures with those of the transferor court.